Filed 11/17/14  Adoption of A.N. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| Adoption of A.N. et al., Minors. | |
| C.D., | G049050 |
| Plaintiff and Respondent, | (Super. Ct. No. AD78937) |
| v. | O P I N I O N |
| D.N., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Mary Fingal Schulte, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Law Offices of Joseph W. Singleton and Joseph W. Singleton for Plaintiff and Respondent.

D.N. (Surrogate) appeals from an order after the trial court denied her motion to set aside the orders granting C.D.'s (Wife) stepparent adoption requests. The subjects of the adoption requests were triplets Surrogate gave birth to after she was implanted with eggs provided by a donor and fertilized by Wife's husband L.D. (Husband) (we refer to Wife and Husband collectively as the Ds when the context requires). Surrogate argues the court erred in denying her motion to set aside the adoption orders because she was deprived of her due process right to challenge the validity of the Gestational Carrier Agreement (GCA) that bears her signature and the agreement was invalid. We disagree and affirm the order.

FACTS

*Factual History*

Surrogate, who already had triplets, met and befriended Wife, who had a daughter, at their children's preschool in 2003. Surrogate's marriage dissolved in 2005. She and her children moved into the Ds' "granny flat" in 2009 over Husband's objection. At some point, Surrogate agreed to assist the Ds with having additional children; Surrogate knew Renee Ramsey had previously tried to assist them as a surrogate. On February 3, 2010, the Ds entered into an "Egg Donor Contract" with Natalia Bertotti to purchase her eggs. On February 8, 2010, the Ds and Surrogate all signed a form entitled, "Waiver of Increased Risk In The Use of Unquarantined Semen/Ovum/Embryos." Surrogate printed and signed her name on a line designated for Ramsey.

At some point, Wife provided Surrogate with a GCA between the Ds and Ramsey. Surrogate provided the GCA to her friend, attorney Jerold Rubinstein, who also knew the Ds.

On February 12, 2010, Rubinstein sent the Ds a letter and a copy of the GCA. Rubinstein advised the Ds the GCA, and the previously provided egg donor agreement, were all they needed to proceed. He requested the Ds provide him copies of

2

the agreements after they were signed by them, the surrogate, and the egg donor. Written on the letter is "OK to proceed once agreements signed."

A 17-page GCA has Wife's, Husband's, and Surrogate's signatures all dated February 13, 2010. On the GCA's signature page, page 17, in handwriting it states, "Ok to proceed." Around the same time, they also executed a document entitled, "Waiver for Psychological Screening." A document entitled, "Waiver of 6-Month Quarantine for Directed Sperm Donor" also has their signatures and is dated March 17, 2010.

Both Wife and Surrogate underwent in vitro fertilization (IVF) treatments with Dr. Brian Acacio at the Acacio Fertility Center (the Center). Surrogate was subsequently implanted with three eggs from Bertotti that were fertilized with Husband's sperm.

Beginning the summer of 2010, Surrogate and Wife developed and pitched a reality television show. The premise of the show was them raising eight children, including two sets of triplets, in the same house.

Surrogate gave birth to triplets, T.N., C.N., and A.N. in October 2010. The birth certificates listed Husband as the father and Surrogate as the mother. When the children went home, they lived with the Ds.

The relationship between the Ds and Surrogate began to deteriorate in April 2012 after a business transaction between Husband and Surrogate's friend imploded. The Ds would not let Surrogate see the triplets, and Husband told Surrogate to vacate the home.

*Procedural History*

In June 2012, Wife filed stepparent adoption requests for each of the triplets in probate court (case No. AD78937). The requests named Surrogate as the birth mother and Husband as the birth father, and stated Surrogate had signed a consent.

3

Four months later, Surrogate filed a petition to establish a parental relationship requesting custody and visitation in family court (case No. 12P001458). Surrogate's family law notice regarding related cases indicated there were no related cases.

Days later, probate court investigator Joe Duquesnel filed a report recommending the trial court grant Wife's stepparent adoption requests. Duquesnel based his recommendation, on among other things, interviews with the Ds, Acacio's statement, and the GCA.

The following month, Husband filed a response in family court to Surrogate's petition to establish parental relationship (case No. 12P001458) arguing Surrogate was not the triplets' mother pursuant to the GCA, which was attached as an exhibit. Husband's family law notice regarding related cases indicated there was a related case, Wife's stepparent adoptions requests, case No. AD78937.

On December 7, 2012, Surrogate filed an objection to Wife's stepparent adoption requests (case No. AD78937).[1] The following month, the trial court, Judge Caryl Lee, overruled Surrogate's objection, explaining Surrogate did not have standing to object, the objection failed to state facts supporting relief, and she did not serve the objection on the Ds. Judge Lee stated the GCA, which Surrogate included as an attachment to the objection, established Surrogate was a gestational carrier and "[s]he ha[d] no biological relationship to the children."

The Ds filed an unlawful detainer action against Surrogate, and she demurred. The trial court, Judge Corey S. Cramin, later sustained Surrogate's demurrer with leave to amend. At a hearing in probate court the next day, Wife and Husband executed the adoption agreements, and Judge Lee entered the adoption orders.

---

[1] Surrogate's objection is not part of the record on appeal.

4

There was a hearing in family court the following week on Surrogate's petition to establish parental relationship (case No. 12P001458) before Judge Claudia Silbar. Husband's counsel indicated the probate court had already issued adoption orders and the trial court should dismiss Surrogate's petition. Surrogate responded she was not notified of and was unaware of the adoption proceedings. Judge Silbar advised Surrogate that if she was contesting the adoption, she must do so in probate court. After Judge Silbar indicated she was aware of Judge Lee's orders granting the adoptions, Surrogate requested the matter be stayed. Judge Silbar granted Surrogate's request to stay the matter pending her contesting the adoption orders in probate court.

In March 2013, Surrogate filed a motion to set aside the adoptions (case No. AD78937), pursuant to Family Code section 9102[2] and Code of Civil Procedure section 473.5. The motion included points and authorities, Surrogate's declaration, and a request for judicial notice of court documents in case No. 12P001458, bankruptcy proceedings, and the unlawful detainer action. In her motion to set aside the adoptions, Surrogate argued the GCA was fraudulent, she did not receive proper notice of the adoption proceedings, and the parties' intent was to raise the children together in the same house. The matter (case No. AD78937) was assigned to Judge Mary Fingal Schulte for all purposes.

The next month, Wife opposed Surrogate's motion to set aside the adoptions. Wife supported her motion with numerous declarations and exhibits. Wife's declaration included numerous exhibits, including the GCA and the three "waiver" documents described above.

At a hearing two weeks later, Judge Schulte discussed with counsel whether to have trial by declaration or to conduct an evidentiary hearing. Surrogate requested an

---

[2] All further statutory references are to the Family Code, unless otherwise indicated.

5

evidentiary hearing, which was set for July 2013.  The trial court stated it would not consider any of the declarations.

At the outset of trial, counsel agreed testimony would be limited to the issue of fraud, which Surrogate had to establish by clear and convincing evidence, before addressing the issue of the children's best interests (§ 9102, subd. (c)).

*Surrogate's Evidence*

Surrogate offered the testimony of four witnesses, including herself, Wife, Husband, and Rubinstein.  Surrogate testified she still lived in the granny flat with her children.  Surrogate explained that when she agreed to help the Ds with having children, "[they] were basically creating a family, a modern-day family."  She added that "[m]ean[t] [they] are all living together under one roof raising eight children."  Surrogate denied she signed a surrogacy agreement with the Ds.  However, Surrogate admitted she saw the Ds' agreement with Ramsey.  Surrogate stated she "probably" provided the GCA to Rubinstein to review.  Surrogate said she did not discuss the agreement with Rubinstein, other than to tell him she would not sign the agreement.  Surrogate admitted she signed documents Acacio required to begin the treatments.  She stated that while she was in the hospital, staff asked if there was a surrogacy agreement but she did not provide one.  Surrogate stated she did not see the GCA until Husband filed his response to her petition to establish a parental relationship.  She admitted it appeared to be her signature on the GCA.  She testified, "I didn't sign a contract.  I signed maybe a piece of paper."  Surrogate stated she was financially obligated to pay the costs of the children's births.

On cross-examination, Wife's counsel explored the concept of the "modern-day family."  Surrogate testified she thought "[they] were going to remain a family."  When counsel asked her whether in July 2009 she told Wife that Surrogate would be a parent to any children born, she replied, "I think it was implied in the intent."  She described the "modern-day family" as one where all the adults would share responsibility for raising the children and maintaining the household.  She admitted that

6

during the course of the process she referred to herself as a surrogate, "like a stand-in," but she could not remember whether she referred to herself as a parent to the children. She added Husband said "it takes a village to raise these children[]" and she interpreted that to mean "[they] were raising the children together." She admitted though the Ds did not make her any promises concerning her future with their family. She did not remember how she discovered the GCA and did not remember providing it to Rubinstein. On redirect examination, Surrogate testified she signed page 17 of the GCA because she believed Acacio needed it to begin treatment.

Wife testified pursuant to Evidence Code section 776. Wife testified the Center advised her she needed a surrogacy contract to proceed. Wife explained she showed Surrogate a copy of their surrogacy contract with Ramsey and changed the names. Wife said she reviewed the agreement with Surrogate, who said she was "'comfortable with signing anything . . . because [Wife did not] have to worry about [her] taking [Wife's] babies[,]'" and they signed the GCA together. Wife stated Surrogate told her she was acting as a surrogate "'out of the goodness of her heart'" and Wife did not have to worry because Surrogate had "'more than [she could] handle.'" Wife stated Surrogate later changed her mind about compensation and the Ds paid her about $15,000 for plastic surgery. Wife explained Surrogate told Wife that Surrogate's name had to be on the children's birth certificates for Surrogate's ex-husband's insurance to cover the medical bills. Wife admitted she was lax in getting the birth certificates changed.

On cross-examination, Wife testified it was Surrogate's idea to act as a surrogate for the Ds. Wife explained there was never an issue as to who the children's parents would be because "she was just the vessel to carry the children." Wife added Surrogate never expressed an interest in being a parent to the children and to the contrary stated she did not want young children because she loved dating. Wife stated Surrogate was present when Acacio stated they had to complete a surrogacy agreement before he would proceed with the treatments.

7

Husband also testified pursuant to Evidence Code section 776. Husband testified he reviewed and signed the GCA. Husband explained he was opposed to entering into an agreement with Surrogate because he was concerned about her integrity. He signed the GCA though because Wife assured him Surrogate "was just a surrogate." He spoke with Rubinstein one time before signing the GCA. He did not witness Surrogate sign the GCA. Husband never intended to be a co-parent with Surrogate. Husband stated counsel advised them not to allow Surrogate to interact with the children after Surrogate filed her paternity action.

Rubinstein testified he met Surrogate in 2009 and she introduced him to the Ds. Rubinstein explained Surrogate provided him with a GCA and asked him to review it for her. Rubinstein, a nonpracticing lawyer, said the agreement was prepared for other parties. Rubinstein stated he was not acting as counsel for either Surrogate or the Ds. Rubinstein told Surrogate and the Ds the agreement needed to be changed to reflect the correct parties and it needed a new signature page. Rubinstein refused Surrogate's request to make the changes. On cross-examination, Rubinstein testified he drafted the February 12, 2010, letter to the Ds at Surrogate's request. Rubinstein said Surrogate told him that she was going to be a surrogate and never mentioned she was going to be a parent to the children.

*Wife's Witnesses*

Wife offered the testimony of numerous witnesses, including herself. Wife repeated much of her testimony about Surrogate's intent to be a surrogate for the Ds because she wanted to help a friend. She added Surrogate told her that she had reviewed the surrogacy agreement and compared it to other agreements and thought it was "'fine.'"

Bertotti testified she entered into a contract with the Ds in February 2010. Bertotti stated her intent was for the Ds to be the parents of any children born from her eggs. Bertotti said Surrogate told her that she was going to be a surrogate for the Ds "out of the kindness of her heart [as a] favor for them." Bertotti said Surrogate never

8

mentioned she was going to be a parent to the children. On cross-examination, Bertotti stated the Ds had their contract prepared and she knew they had a contract with Surrogate, but she had not seen it.

Karen Colley testified she knew the Ds and Surrogate well and she had numerous conversations with Surrogate about her acting as a surrogate for the Ds. Surrogate told Colley that she knew the Ds were having difficulty getting pregnant and she wanted to help. Surrogate never mentioned to Colley that she wanted to be a parent to the children. Surrogate referred to herself as "auntie" to the children.

Jennifer Arundale testified she developed a reality television show with the Ds and Surrogate titled, "Triplets for a Friend." Arundale shot production video where Surrogate stated she was acting as a surrogate as a favor to Wife and she never referred to herself as a parent.[3] At a party, Arundale asked Surrogate if it was strange to live downstairs while all the children lived upstairs. Surrogate replied, "No. They're [the Ds] babies, not mine."

Tori Crummack testified she had known Wife for 30 years and Surrogate for eight years. At a beach party, Surrogate told Crummack that she was acting as a surrogate because "'it [was] time for [Wife] to finally get her baby.'" Crummack testified Surrogate referred to herself as an "auntie-type figure" and not as a parent.

Acacio testified both Surrogate and Wife were patients of the Center. Acacio testified it was standard practice for the intended parents and the gestational surrogate to enter into a signed agreement before treatment. Acacio said the parties generally submit a copy of the agreement's signature page so he is not privy to the details of the agreement. Acacio said Wife, Husband, and Surrogate were aware of the policy.

---

[3]     During Arundale's testimony, a DVD of the pitch for the reality television show was played for the trial court and admitted into evidence. That DVD was not transmitted to this court as an exhibit.

9

When presented with the letter from Rubinstein and the GCA, Acacio admitted he wrote the "'Ok to proceed'" language on both.

After the close of evidence, the trial court admitted exhibits, took judicial notice of some of the court documents, and heard argument. Surrogate argued the GCA was fraudulent because she never saw the entire agreement and there was no evidence as to who revised the first and last pages to reflect she had replaced Ramsey. In the alternative, she argued that if the court found the GCA was valid, the Ds did not comply with it because they did not timely establish their parental rights. Wife contended the GCA was "repurposed" with the first and last pages revised. Wife argued Surrogate failed in her burden to establish by clear and convincing evidence the GCA was fraudulent. She concluded the evidence demonstrated Surrogate never intended to be a parent to the children.

In a minute order dated August 23, 2013, Judge Schulte denied Surrogate's motion to set aside the adoption orders. The trial court explained it considered the exhibits and the witnesses' testimony but not the declarations. The court stated the case turned on the witnesses' credibility, and it opined Wife "was the most credible." The court explained the evidence established the Ds were the intended parents and Surrogate was the gestational surrogate and would not have any parental rights to the children. As to Surrogate's claim the GCA was fraudulent, the court stated Surrogate signed the last page of the GCA and "[i]f she did not read it, that is her own fault or failing." The court also stated Surrogate filed an objection to Wife's stepparent adoption requests, which Judge Lee decided. The court added Surrogate did not allege specific facts establishing fraud by clear and convincing evidence warranting setting aside Judge Lee's ruling (§ 9102). After explaining the surrogacy arrangement in this case is a "gestational surrogacy" (§ 7960), the court stated an agreement executed in accordance with section 7962's requirements is presumptively valid and when those requirements are not satisfied, the presumption of validity is rebutted (§ 7962, subd. (i)). The court added

10

though that failure to comply with the requirements is not dispositive because the court may find the intended parents are the parents based on sufficient proof (§ 7962, subd. (f)(2)). The court clarified, "This judge is not hearing or considering such an action. That action is pending before Judge Silbar in the family law court. It is rendered moot by the order denying set aside of the adoptions of the triplets."

The trial court described Surrogate as "a very loving person who made a magnanimous gesture" for the Ds but who provided "extremely vague" testimony and was "somewhat non-responsive." The court stated Surrogate testified she did not discuss the GCA but admitted she signed it. The court explained the most specific testimony Surrogate provided was they were creating a "modern-day family," but she could not define that concept with specificity and she admitted the Ds did not make her any promises. The court believed Wife's testimony concerning what Surrogate told Wife, i.e., that she was acting as a surrogate "out of the goodness of her heart" and there was no need for a contract because Wife "never had to worry about her taking her babies." The court believed Wife's testimony "there was 'never any question'" who the intended parents were.

The trial court described Husband as "not the best witness" but it was clear he never intended to co-parent with Surrogate. The court found Bertotti's testimony Surrogate told her she was a "surrogate" for the Ds "very credible." Finally, the court found Colley's and Arundale's testimony Surrogate told them she was a surrogate for the Ds and the Ds were the parents to be credible. The court concluded the evidence supporting the Ds contention the adoptions should not be set aside was "overwhelming" and Surrogate failed to satisfy her burden of proof.

The trial court's statement of decision, which incorporated by reference its August 23, 2013, minute order, was filed October 29, 2013. The court found the following: (1) the Ds were the intended parents of the surrogacy agreement;

11

(2) Surrogate was intended to be the gestational surrogate and would not have any parental rights; (3) Surrogate signed the surrogacy agreement; (4) the Ds did not promise Surrogate that she would be a co-parent; (5) Surrogate filed an objection to the adoptions, and the trial court ruled upon that objection; (6) Surrogate failed to present sufficient reasons to set aside the adoption; and (7) Surrogate failed to satisfy her burden of proof of establishing fraud. Surrogate filed a timely notice of appeal from the order denying her motion to set aside the adoption orders.

## DISCUSSION

Surrogate argues the trial court erred in denying her motion to set aside the adoption orders because she did not have notice and an opportunity to challenge the GCA. Relying on section 7962, Surrogate contends she has repeatedly been denied the opportunity to challenge the validity of the GCA first by Judge Lee (Surrogate lacked standing), then by Judge Silbar (Surrogate had to challenge the adoptions in probate court), and then by Judge Schulte (the issue was pending before Judge Silbar in family court), and the Ds did not comply with section 7962. Her contentions lack merit.

Section 9102, subdivision (c), provides: "In any action to set aside an order of adoption pursuant to this section or [s]ection 9100, the court shall first determine whether the facts presented are legally sufficient to set aside the order of adoption. If the facts are not legally sufficient, the petition shall be denied. If the facts are legally sufficient, the court's final ruling on the matter shall take into consideration the best interests of the child, in conjunction with all other factors required by law." We review a trial court's order on a motion to set aside an adoption order for substantial evidence. (See *Adoption of B.C.* (2011) 195 Cal.App.4th 913, 920 [§ 9102 substantively identical to its predecessor Civ. Code, § 228.15, which was substantively identical to its predecessor Civ. Code, § 227d]; *Walter v. August* (1960) 186 Cal.App.2d 395, 397 [addressing § 9102's predecessor Civ. Code, § 227d].)

12

Here, the trial court properly denied Surrogate's motion to set aside the adoption orders because Surrogate did not satisfy her burden of proving fraud by clear and convincing evidence. The evidence at trial overwhelmingly established Surrogate intended to be just that, a surrogate, and not a parent to the children she gave birth to as a result of the agreement with the Ds. Wife testified Surrogate told Wife that she did not have to worry because Surrogate had "'more than [she could] handle.'" Husband testified Wife told him that he did not have to worry because Surrogate was just a surrogate. Surrogate's friend, Rubinstein, testified Surrogate told him that she was going to be a surrogate and never mentioned she was going to be a parent to the children. Bertotti, Colley, Arundale, and Crummack all testified Surrogate referred to herself as a surrogate or an "auntie" and never as a parent to any children born as a result of the agreement with the Ds.

Additionally, the evidence at trial established Surrogate reviewed and signed the GCA. Wife testified she showed Surrogate a copy of their surrogacy contract with Ramsey, Surrogate told Wife that she was "'comfortable with signing anything,'" Wife changed the names, and they signed the GCA together. Rubinstein testified Surrogate provided him with a GCA, asked him to review it for her, and asked him to revise it. Surrogate eventually admitted she signed the GCA, although she claimed she had only page 17, the signature page. Based on the entire record, the trial court could reasonably conclude Surrogate's role was limited to being a surrogate and the Ds were the intended parents of any children born to Surrogate as a result of their agreement. The court could also reasonably conclude Surrogate reviewed and signed the GCA knowingly and voluntarily and not as a result of fraud.

Moreover, Surrogate offered no clear and convincing evidence to refute the conclusion the Ds were the intended parents of any children born to her as a result of their agreement and her role was limited to that of a surrogate. Surrogate testified they were creating a "modern-day family." She could not explain though exactly what that

13

meant.  The best she could do was to explain all three adults would share responsibility for raising the children.  But she admitted the Ds did not make her any promises concerning her future with the family.  Tellingly, Surrogate testified her belief she would be a parent to any children "was *implied* in the intent."  (Italics added.)  Based on the entire record, the trial court properly denied Surrogate's motion to set aside the adoption orders because she failed to show her agreement with the Ds was the result of fraud.

Surrogate argues she did not have notice and an opportunity to challenge the GCA.  She also contends the Ds did not comply with section 7962's requirements.  Neither claim has merit.

Surrogate first claims she did not have notice of Wife's stepparent adoption requests or an opportunity to challenge the validity of the GCA.  The record belies her claims.  Wife filed stepparent adoption requests in probate court.  Months later, Surrogate filed a petition to establish parental relationship in family court.  At that time, Surrogate was unaware of Wife's stepparent adoption requests in probate court.  When Husband responded to Surrogate's petition in family court and indicated there was a related case in probate court, Wife's stepparent adoption requests, this afforded Surrogate notice of Wife's requests.  Surrogate subsequently filed an objection to Wife's stepparent adoption requests.[4]  Judge Lee reviewed and considered the objection and the attached GCA before ruling Surrogate did not have standing to object.

Surrogate's motion to set aside the adoption orders asserted the GCA was fraudulent.  Surrogate relies on language from Judge Schulte's minute order stating she was not hearing a section 7962 action to establish a parent-child relationship to contend Judge Schulte did not consider her claim the GCA was fraudulent.  A complete reading of Judge Schulte's minute order compels a different conclusion.  After stating the basis of Surrogate's motion was fraud, Judge Schulte explained the evidence demonstrated the

---

[4]        See ante footnote 1.

14

parties did not intend for Surrogate to be a parent to any children, Surrogate signed the GCA, and Surrogate had notice of the adoption proceedings before Judge Lee. Judge Schulte concluded, "[I]f [Surrogate] did not read [the GCA], that is her own fault or failing." Thus, Surrogate had notice of and an opportunity to challenge the validity of the GCA.

Surrogate's second contention is the gravamen of her appeal. Surrogate contends the GCA does not comply with section 7962's substantive requirements and Wife did not comply with its procedural requirements. As we explain below, due to the timing of the enactment of section 7962, the Ds did not need to comply with section 7962.

Section 7962, subdivision (a), requires an assisted reproduction agreement to contain the date on which the agreement was executed, the names of the people from which the gametes originated, unless anonymously donated, and the names of the intended parent(s). The surrogate and the intended parent(s) must be represented by separate licensed attorneys prior to executing the written assisted reproduction agreement (§ 7962, subd. (b)), and the assisted reproduction agreement for gestational carriers must be executed by the parties and properly notarized or witnessed (§ 7962, subd. (c)).

To establish a parent-child relationship between the intended parent(s) and the child conceived pursuant to an assisted reproduction agreement, the intended parent(s) must lodge a copy of the assisted reproduction agreement and declarations attesting to compliance with section 7962's requirements. Compliance with all section 7962's requirements rebuts the presumption the gestational carrier surrogate, her spouse, or partner is a parent to any children. Noncompliance with any of section 7962's requirements rebuts the presumption of the validity of the assisted reproduction agreement (§ 7962, subd. (i)). However, section 7962, subdivision (f)(2), provides in relevant part, "Nothing in this section shall be construed to prevent a court from finding and declaring that the intended parent is or intended parents are the parent or parents of

15

the child where compliance with this section *has not been met*; however, the court shall require sufficient proof entitling the parties to the relief sought." (Italics added.)

Surrogate complains the GCA does not comply with section 7962's requirements, and Wife engaged in subterfuge and filed the stepparent adoption requests because she knew the GCA did not satisfy its requirements. Wife, Husband, and Surrogate executed the GCA on February 13, *2010*. The Ds relationship with Surrogate began to deteriorate in April 2012. Two months later, in June *2012*, Wife filed the stepparent adoption requests.

Section 7962 was not enrolled and presented to the Governor until three months later, on September 12, 2012. (Stats. 2012, ch. 466, § 3.) The Governor signed Assembly Bill No. 1217 on September 23, 2012. Section 7962 became effective on January 1, 2013, a fact Surrogate acknowledges in her reply brief, nearly three years after Wife, Husband, and Surrogate executed the GCA, and six months after Wife filed her stepparent adoption requests. (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2014) ¶¶ 7:450-7:450.1, pp. 7-176.1 to 7-176.2 [before § 7962 effective Jan. 1, 2013, California law governing surrogate mother's parental custody rights covered by existing parentage and adoption statutes].) Surrogate's assertion the Ds did not comply with section 7962 in executing the GCA is not surprising as the GCA was executed three years before section 7962 became effective. Section 7962, subdivision (f)(2), authorizes a trial court to find the intended parent(s) are the parents in situations like the one before us here—where the parties have not complied with section 7962 but the evidence demonstrates the parties intended the intended parent(s) to be the parents of any children and the Surrogate to be the surrogate and not a parent.

Additionally, Surrogate's claim Wife tried to make an end-run around section 7962's procedural requirements is refuted by the fact Wife filed her stepparent adoption requests six months before section 7962 became effective. As we explain

16

above, the evidence at trial established the Ds were the intended parents of any children born to Surrogate as a result of the GCA and Surrogate was not an intended parent.

## DISPOSITION

The order is affirmed. Respondent is awarded her costs on appeal.

O'LEARY, P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

17